482 A.2d 886

**Richard Mark WINTERS**

v.

**STATE of Maryland.**

**No. 126, Sept. Term, 1983.**

Court of Appeals of Maryland.

Oct. 24, 1984.

---

216

Joseph F. Murphy, Jr., Towson (White & Murphy, Towson, on the brief), for appellant.

Gary P. Jordan and Bruce C. Spizler, Asst. Attys. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on the brief), for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, DAVIDSON,* RODOWSKY and COUCH, JJ., and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired), specially assigned.

COUCH, Judge.

Richard Winters was tried before a jury, in the Circuit Court for Anne Arundel County, and convicted of conspiracy to violate the Maryland tax law, and filing fraudulent State income tax returns. The defendant took an appeal to the Court of Special Appeals. Thereafter, this Court, on its own motion, issued a writ of certiorari prior to a decision by the intermediate appellate court.

The issues we are asked to consider are:

"1) Whether the trial court committed prejudicial error by denying Appellant's Motion for Suppression of Evidence seized from his home.

2) Whether the trial court committed prejudicial error by permitting improper cross-examination of Appellant's character witnesses.

3) Whether the trial court committed prejudicial error by denying Appellant's Motion for Dismissal of the Conspiracy Count (Count I) of the Indictment.

4) Whether the trial court committed prejudicial error by denying Appellant's Motion to Dismiss the Substantive Counts of the Indictment.

5) Whether the trial court committed prejudicial error by denying Appellant's Motion for a Judgment of Acquittal on the Substantive Counts of the Indictment.

---

* Davidson, J., participated in the hearing and in the conference of the case in regard to its decision, but because of illness did not take part in the adoption of the opinion.

6) Whether the Court committed prejudicial error by incorrectly answering the jury's question directed to the court concerning the dates set forth in the conspiracy count."

We shall answer these questions seriatim.

## Facts

In setting forth the facts of this case we shall merely provide the factual framework that led to the indictment and subsequent trial of appellant, Richard Winters. Thereafter we shall provide the necessary factual predicate as each specific issue is addressed.

The Attorney General's office, in conjunction with the Maryland State Police was conducting an investigation into various forms of criminality in Frederick County, Maryland. During the course of that investigation it was believed that certain individuals, including appellant, were involved in illegal drug activities. This information led to a cooperative investigative effort with the United States Drug Enforcement Administration (hereinafter referred to as "DEA").

While appellant was under investigation for drug involvement, the authorities received information concerning alleged tax violations on the part of the partners in the Osburn and Winters law firm. This information was initially supplied by Winters' former secretary and girlfriend, Edith Eader.

Pursuant to information acquired during the drug investigation a federal search and seizure warrant was issued for appellant's residence. This warrant was executed on September 23, 1982. Detective Sergeant Thomas H. Carr, a Maryland State Police officer assigned to the Attorney General's office, Criminal Investigations Division, who had been involved in the joint narcotics investigation from its inception, assisted the federal agents in the execution of the warrant. Carr was also on the premises to serve a subpoena in regard to the tax investigation.

During the search Carr discovered twenty-two sheets of lined yellow paper, approximately $8\frac{1}{2}'' \times 14''$, which contained a listing of names, dates, and dollar amounts. Carr examined the sheets to see if they were papers relating to the transportation, ordering, purchase or distribution of controlled dangerous substances; records, notes and other papers relating to the drug investigation were among the items listed on the federal warrant as property to be seized. Robert Osburn, appellant's law partner,[1] was present during the search. He identified the yellow sheets as an accounting of legal fees paid to the Osburn and Winters law firm. Carr had previously been informed by Edie Eader that appellant kept such a list of income received from cash fees that were not reported on his income taxes; she had also shown Carr photo copies of these lists. The information supplied by Eader coupled with Osburn's statement led Carr to recognize that these sheets did not pertain to the drug investigation, but that they were related to the state tax investigation.

Carr then telephoned the Attorney General's office and an application for a search and seizure warrant was prepared for the sheets. The federal search and seizure warrant, an affidavit, and an application for a state search and seizure warrant were submitted to Judge Stepler, District Court of Maryland sitting in Frederick County. The affidavit, by Carr, set forth his reasons for believing the yellow sheets were evidence relating to the commission of criminal violations of Maryland State Income Tax laws. Moreover, the affidavit set forth his authority to be on the property where he discovered the yellow sheets by reciting the circumstances of the joint drug investigation and referencing the DEA search and seizure warrant for Winters' residence. A copy of the federal search warrant was attached to the state affidavit. However, the affidavit which supported the issuance of the federal warrant was not

---

1. Mr. Osburn was a co-defendant in this case. *See Osburn v. State,* 301 Md. 250, 482 A.2d 905 (1984).

attached; the federal affidavit was under seal at the time the state warrant was applied for. Judge Stepler signed the state warrant and the twenty-two yellow sheets were seized from Winters' home on September 23, 1982.

Prior to trial Winters unsuccessfully sought dismissal of the indictment and suppression of the evidence seized from his residence.

I

Appellant initially asserts that the trial court committed prejudicial error by denying the motion to suppress evidence seized from his home. He attempts to support this position by attacking the validity of both the state and federal search and seizure warrants.

(a)

*State Warrant*

Appellant contends that the search warrant signed by Judge Stepler should not have been issued. This is so, he argues, because the state warrant was based upon an affidavit containing information acquired by applicant, Detective Carr, while participating in the execution of the federal warrant, and that the affidavit upon which the federal warrant was based was not presented to Judge Stepler. Appellant argues under the authority of *Brooks v. State*, 13 Md.App. 151, 282 A.2d 516 (1971), *cert. denied*, 264 Md. 746, 749, 750 (1972), that where a search warrant is sought based on observations during the execution of a preceding warrant, the issuing judge must review the affidavit of the first warrant to determine whether probable cause justified the initial intrusion. We think appellant reads *Brooks* too broadly.

In *Brooks*, there were two raids of the same premises, four days apart. The first raid was undertaken pursuant to a search and seizure warrant. While on the premises the officer observed but did not seize certain property which subsequent investigation revealed to be stolen goods. The officer thereafter applied for a second search warrant based

on his observations. In the affidavit for the second warrant the officer asserted that the first warrant had been issued, but a copy of the first warrant and the application therefor were not attached to the second application.

The Court of Special Appeals held that the appellants had no standing to raise Fourth Amendment claims. *Brooks,* 13 Md.App. at 157, 282 A.2d at 520. However, in dicta the court stated that the conclusory statement by the affiant in the affidavit for the second warrant (as to the existence of the first warrant) rendered the second warrant defective. This was so, the court explained, because "conclusory statements without underlying facts by the affiant that probable cause exists, are not adequate to support the issuance of a search warrant;" and "probable cause must be determined by the magistrate, based on the facts presented to him in the affidavit." *Brooks,* 13 Md.App. at 154, 282 A.2d at 518–19. The court was thus stating the basic concepts of Fourth Amendment law—the principles that ensure that the guarantees of the Fourth Amendment are protected.

■ The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." The protection of the Fourth Amendment consists in requiring that a search warrant be issued only after a neutral and detached magistrate determines that probable cause exists "therefor from facts or circumstances presented to him under oath or affirmation," in order to justify an invasion of privacy. *Nathanson v. United States,* 290 U.S. 41, 47, 54 S.Ct. 11, 13, 78 L.Ed. 159, 162 (1933). *See also State v. Edwards,* 266 Md. 515, 295 A.2d 465 (1972) (need underlying circumstances supporting affiant's conclusions); *Henderson v. State,* 243 Md. 342, 221 A.2d 76 (1966) (finding of probable cause to be made from the allegations of the application for the warrant, cannot be purely conclusory); *Brooks v. State, supra* (conclusory statements without underlying facts are not adequate).

■ Judge Stepler, in this instance, had the first warrant presented to her. Given the courts' preference for searches pursuant to a warrant, and the deference that is to be accorded an issuing magistrate's determination of probable cause to issue a warrant, *see Massachusetts v. Upton,* —— U.S. ——, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984); *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), Judge Stepler could reasonably rely on the validity of the federal warrant together with other facts presented to her. Therefore, unlike the situation in *Brooks,* Judge Stepler did not merely " 'accept the affiant's conclusions and thus [did not] "serve merely as the rubber stamp for the police." *Aguilar v. Texas,* 378 U.S. 108, 112 [, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723, 727 (1964) ].' " *Brooks,* 13 Md.App. at 155, 282 A.2d at 519 [quoting *Grimm v. State,* 7 Md.App. 491, 493, 256 A.2d 333, 334 (1969) ].

■ Appellant now asks this Court to expand his reading of the dicta in *Brooks* to require the issuing magistrate not only to make an independent determination of probable cause for the issuance of the second warrant, but also to determine if probable cause existed for the issuance of the first warrant, when that warrant is attached to and is an underlying fact in determining probable cause to issue the subsequent warrant. We decline to do so because we do not think that *Brooks* requires the magistrate who issues the second warrant to determine if probable cause existed to issue the first warrant; if it did it would be contrary to law.

■ What appellant advocates as the duty of the warrant-issuing judge interfuses two distinct principles of law—the warrant requirement of the Fourth Amendment, and the judicially created exclusionary rule. In our system of justice, these two principles take effect at different stages in the proceedings; appellant's contention can be more appropriately addressed at the later stage. Therefore, we find no error was committed by Judge Stepler. She issued the

state warrant only after making an independent determination of probable cause based on facts and circumstances presented to her including the issuance of the federal warrant; thus, appellant's Fourth Amendment privacy expectations were protected.

■ Appellant's only attack on the issuing judge's determination of probable cause in this case rests on her failure to determine probable cause for the issuance of the federal search warrant. We hold that the issuing state judge had no obligation to determine the existence of probable cause for the issuance of the federal warrant. Therefore, issuing the state warrant based on probable cause contained in the state affidavit was not improper.

A motion to suppress evidence obtained as a result of the state search warrant was heard and denied by the trial court. At that hearing appellant asserted the aforesaid issue as well as two issues directly related to the issuance of the federal search warrant. The trial court reviewed the affidavit upon which the federal warrant was issued and found that there was "clear probable cause to issue the federal warrant."

### (b)

### *Federal Warrant*

Appellant advances two reasons for contending that the federal warrant was invalid. First, he attacks the adequacy of the affidavit upon which the federal warrant was based. Second, he questions the propriety of Detective Carr's participation in the execution of the federal warrant. He contends that if the federal warrant is invalid for either of these reasons, evidence derived from the federal search is tainted and its existence may not be used as a valid basis for establishing probable cause in the application for the state search and seizure warrant under our holdings in *Carter* and *Everhart*.

### (i)

As the initial basis for this contention appellant asserts that the affidavit in support of the federal warrant con-

tained a false statement of a material fact requiring redaction of so much information that the remaining allegations did not establish probable cause for the search.

This contention is predicated on a statement made in the federal affidavit in reference to the second confidential informant. Source number two was identified at the suppression hearing by Detective Carr as Edith Eader. She was alleged by the federal affiant, Special Agent William L. Athas, to be a reliable source since her admissions were a "Declaration Against Penal Interest." However, Detective Carr testified at that hearing that Eader had received immunity from federal and state authorities before she provided the information related in the affidavit.

All parties agree that Eader's statements could not have been against her penal interest if she had previously received immunity. Additionally, there is agreement that the "assertion" of Athas may not be used to bolster the veracity of Eader. However, appellee asserts that the characterization of the use of the term declaration against penal interest as a false statement of a material fact is unduly harsh; and, further, that when judged under the standards of probable cause of *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the remaining information in the affidavit is more than adequate to support the issuance of the federal warrant in this case. We agree.

■ Technically, Edith Eader did not make a declaration against penal interest since she had received complete immunity from prosecution prior to providing information to the authorities. However, we cannot agree with appellant's contention that "her information would have been totally useless unless it was falsely alleged to constitute a declaration against penal interest." Appellant would have the Court excise the entire statement under authority of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). We think the appropriate remedy is to discount that phrase that tends to bolster the credibility of Eader,

and then evaluate the affidavit without considering her statement as a declaration against penal interest.

Appellant's basic argument is that if the information obtained from Eader is not a declaration against penal interest, then the veracity and reliability of this source is not demonstrated in the affidavit; the foundation for this reasoning are the principles set forth in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). However, appellant's singular reliance on *Aguilar* and *Spinelli* is unfounded in view of the Supreme Court's decision in *Gates.*

■ *Gates* replaced the rigid technical analysis of the reliability of informant data in *Aguilar* and *Spinelli* with a more flexible approach. *Massachusetts v. Upton,* —— U.S. ——, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984); *see also Potts v. Maryland,* 300 Md. 567, 479 A.2d 1335 (1984). (*Gates* decision applied to pre-*Gates* search warrant). "Veracity," "reliability," and "basis of knowledge" are still considered relevant inquiries. *Gates,* 462 U.S. at ——, 103 S.Ct. at 2329, 76 L.Ed.2d at 545. However, rather than give them independent status, they are to be considered in the "totality of circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.*

In *Gates,* the Court illustrates the application of the totality of the circumstances assessment. One indicia of reliability is particularly relevant to our inquiry in the case *sub judice:*

"[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case."

*Gates,* 462 U.S. at ——, 103 S.Ct. at 2329–30, 76 L.Ed.2d at 545.

■ In this instance Eader provided a significant amount of detailed information in the affidavit, most of which was observed first-hand. Moreover, much of this information was independently corroborated by the law enforcement authorities during the drug investigation. The totality of the circumstances would indicate that the confidential informant in question was giving credible information. Moreover, Agent Athas was an experienced drug investigator, assigned to the DEA. His interpretation of all this information led him to assert in the affidavit that there was probable cause to believe that controlled dangerous substances and records related to drug transactions would be found at appellant's home; considerable credit can be given to the expertise of law enforcement officers. *Gates,* 462 U.S. at ——, 103 S.Ct. at 2328, 76 L.Ed.2d at 544; *Gatewood v. State,* 244 Md. 609, 616, 224 A.2d 677, 682 (1966); *Henderson v. State,* 243 Md. 342, 344, 221 A.2d 76, 77 (1966).

On the basis of the facts and circumstances contained in the affidavit a magistrate issued the search warrant. The facts relied upon "are sufficient if they are such as to warrant a prudent and cautious man in believing the offense has been committed." *Lucich v. State,* 194 Md. 511, 514, 71 A.2d 432, 434 (1950); *Dean v. State,* 205 Md. 274, 107 A.2d 88 (1954); *Fleming v. State,* 201 Md. 145, 92 A.2d 747 (1952); *Smith v. State,* 191 Md. 329, 62 A.2d 287 (1948), *cert. denied,* 336 U.S. 925, 69 S.Ct. 656, 93 L.Ed. 1087 (1949). This is in accord with the Fourth Amendment's expressed preference for "searches conducted pursuant to a warrant." *Gates,* 462 U.S. at ——, 103 S.Ct. at 2331, 76 L.Ed.2d at 547; *United States v. Leon, supra; United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

■ The traditional standard of review by an appellate court has been reaffirmed by the United States Supreme

Court to reflect the preference for the warrant process. As "long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates,* 462 U.S. at —, 103 S.Ct. at 2331, 76 L.Ed.2d at 547 [quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697, 708 (1960)]. Moreover the Court also stated in *Gates:*

> "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.' *Spinelli, supra,* 393 U.S. at 419, 89 S.Ct. at 590."

*Gates,* 462 U.S. at —, 103 S.Ct. at 2331, 76 L.Ed.2d at 547.

After carefully examining the record in this case and reviewing the federal affidavit we conclude that there was sufficient indicia of reliability for Eader's information; the federal search and seizure warrant issued was supported by information sufficient to establish probable cause.

### (ii)

Appellant's second basis for contending that the federal warrant is invalid pertains to Detective Carr's participation in the execution of the federal warrant.

The federal warrant authorized the initial search of appellant's home. It stated that the warrant was to be executed by "Special Agent William L. Athas or any other agent of the Drug Enforcement Administration." Because Carr, a Maryland State Policeman, was not listed as a person to whom the federal warrant was directed, appellant contends he was illegally on the premises when he observed evidence which was later used as a basis for establishing probable cause in the application for the state search and seizure warrant. Appellant cites no authority to support this contention. Case law, on the other hand, persuades us that this argument lacks merit.

The statute controlling the issuance of federal search warrants is 18 U.S.C. § 3105 (1982). It reads as follows:

> "A search warrant may in all cases be served by any of the officers mentioned in its direction or by an officer

authorized by law to serve such warrant, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution."

*Id.* In construing this statute the Fifth Circuit Court of Appeals stated:

"This statute does not confer any substantive authority to execute a search warrant, but was meant to enlarge the common law rule which required that a search warrant be directed only to a particular person and be executed only by that person. Fed.R.Crim.P. 41(c) and other empowering provisions of the United States Code provide the substantive authority to conduct a federal search. *See* 18 U.S.C.A. § 3106; *United States v. Sigal*, 341 F.2d 837, 843 n. 13 (3d Cir.) and cases cited, *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). Thus, under federal law a search warrant may be executed by (1) the person to whom the warrant is directed; (2) any officer authorized by law to execute search warrants; or (3) some other person aiding a person under (1) or (2) who is present and acting in the execution of the warrant."

*United States v. Martin*, 600 F.2d 1175, 1181–82 (5th Cir. 1979).

The record in this instance reveals that the Criminal Investigations Division of the Attorney General's office and the Federal Drug Enforcement Administration were jointly investigating narcotics trafficking in Frederick County. Carr, as well as other Maryland State Policemen, participated with the federal law enforcement officers in this cooperative law enforcement venture. After sufficient evidence was obtained a federal search warrant was issued. The search warrant was served by the person to whom it was directed, Special Agent Athas. Members of the Maryland State Police, the Federal Bureau of Investigation, and the Drug Enforcement Administration assisted in the search.

Under these facts Detective Carr was authorized by 18 U.S.C. § 3105 to assist in the search. He was clearly a

person aiding an officer authorized by law to execute the search warrant, who was present and acting in the execution of the warrant. *Petition of Becker,* 515 F.Supp. 1193, 1196 (D.Kan.1981); *accord United States v. Cox,* 462 F.2d 1293 (8th Cir.1972), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974); *Watson v. Commonwealth,* 433 S.W.2d 884 (Ky.1968). Detective Carr was therefore legally on the premises when he observed the evidence appellant sought to have suppressed.

In summary we find that there was no primary illegality in the federal search. It was, therefore, proper to use the evidence Carr discovered during the search to form the basis for the existence of probable cause in the state warrant. Accordingly, there was no error in denying the motion to suppress.

## II

Winters next contends that the trial judge erred by permitting improper cross-examination of his character witnesses: Shankle, a Frederick, Maryland police officer; Bower, an attorney in Frederick County; and Stine, Captain of the Frederick City Police Department.

On direct examination, each of these witnesses testified that Winters had a good reputation for honesty and integrity. Shankle and Bower were asked, on cross-examination, whether they had heard any information which caused them to suspect Winters' reputation. Shankle, over objection, testified that he had "read newspaper articles in the past several weeks in the paper." Bower responded in the negative to the question. Stine was asked on cross-examination whether, as a result of search warrants executed in 1982, he had received information which made him suspicious about Winters' reputation for honesty and integrity. Stine answered in the affirmative.

Winters bottoms his argument on the principle "that accusations of crime or misconduct, as distinguished from convictions, may not be used to impeach the credibility of a

character witness," relying on *State v. Cox,* 298 Md. 173, 468 A.2d 319 (1983), and *Taylor v. State,* 278 Md. 150, 360 A.2d 430 (1976). The state, on the other hand, argues that "the questions posed to the character witnesses were not directed to information concerning prior bad acts of appellant [Winters], but instead, were an effort to probe the veracity of the opinions offered and the witnesses' basis of knowledge in formulating those opinions."

In our view the state's position is correct. The state was seeking to test the witnesses' knowledge; it was not an inquiry specifically directed to a prior bad act. In this sense, then, both *Taylor* and *Cox* are factually inapposite.

In *Taylor,* two witnesses were asked if they knew of two prior convictions of the defendant. It appeared that the defendant was not represented by counsel at either of the prior trials. There we indicated that it would be just as improper to cross-examine a character witness concerning a constitutionally infirm conviction as to cross-examine the defendant himself. *Taylor,* 278 Md. at 155–56, 360 A.2d at 434.

In *Cox,* during cross-examination of the prosecutrix in a rape trial, the defense proffered that she had made a similar accusation against a former boyfriend, but later recanted and admitted she had lied. The trial judge refused to allow this to be developed on cross-examination. In affirming the Court of Special Appeals, which had reversed the defendant's conviction because of prejudicial error by this refusal, we stated in part:

> "In the instant case we are not concerned with the impeachment of a defendant or a character witness. The issue we must resolve is rather straightforward: to what extent may the testimony of a prosecuting witness in a rape case be impeached on cross-examination? We have already stated the general rule that any witness may be cross-examined on matters and facts affecting his credibility, so long as such facts are not immaterial or irrelevant to the issue being tried."

*Cox,* 298 Md. at 180–81, 468 A.2d at 322. Thus, *Cox* simply was not concerned with the issue presented here.

We observe that the questions asked in the case *sub judice* concerned the witnesses' opinions of Winters' character traits for honesty and integrity, as well as his reputation in the community for these same traits. No reference was made during cross-examination to any bad act so far as Shankle and Bower were concerned. The question to Stine, that elicited an answer which did reveal his receipt of information as a result of a search warrant that was executed, could be viewed as inferring that Winters had been engaged in a bad act. However, the question itself was an effort to probe the veracity of the opinions offered and the witnesses' basis of knowledge in formulating those opinions.

We see no abuse of discretion by the trial judge in allowing the cross-examination complained of.

## III

Because Count One of the indictment charged Winters and Osborn in the short form language authorized by Maryland Code (1957, 1982 Repl.Vol.), Article 27, § 40,[2] Winters moved to dismiss that count, which motion the trial court denied. Winters assigns error to this denial. He

---

**2.** Count One of the indictment reads:

"The Grand Jurors of the State of Maryland, for the body of Anne Arundel County, do on their oath present that ROBERT DUDLEY OSBORN, JR. and RICHARD MARK WINTERS, between January 1, 1979 and April 15, 1982, in the County aforesaid, did unlawfully conspire together to violate the Maryland Income Tax Laws, Article 81, § 279 *et seq.,* Annotated Code of Maryland, against the peace, government and dignity of the State.
Art. 27, § 40, Annotated Code of Maryland:
"In any indictment or warrant for the crime of conspiracy, it shall be sufficient to use a formula substantially to the following effect: 'That A–B and C–D on the ..... day of .............., 19...., at the County (City) aforesaid unlawfully conspired together to murder X–Y (or other conspiracy here stating briefly the object of the conspiracy), against the peace, government and dignity of the State.' (An.Code, 1951, § 48; 1945, ch. 87.)"

argues that although the language of Count One stated the conspiracy, it did not properly allege the object of the conspiracy, thus, it is argued, the count was defective. Appellant contends that since the income tax laws can be violated in a variety of ways, the indictment should set out the particular means by which he and Osborn conspired together to violate those laws. We disagree.

It is well settled in Maryland that so long as the object of the conspiracy is set forth in the indictment there is no necessity to also set forth the means by which the conspiracy was intended to be accomplished. *See Pearlman v. State,* 232 Md. 251, 192 A.2d 767 (1963) (conspiracy to cheat and defraud customers by wrongful and indirect means and false pretenses, etc. sufficient), *cert. denied,* 376 U.S. 943, 84 S.Ct. 797, 11 L.Ed.2d 767 (1964); *Piracci v. State,* 207 Md. 499, 115 A.2d 262 (1955) (conspiracy to defraud City of Baltimore—means to accomplish object of conspiracy need not be set out); *Scarlett v. State,* 201 Md. 310, 93 A.2d 753 (1953) (conspiracy to violate lottery laws sufficient to charge a crime), *cert. denied,* 345 U.S. 955, 73 S.Ct. 937, 97 L.Ed. 1377 (1953); *Quaglione v. State,* 15 Md.App. 571, 292 A.2d 785 (1972) (conspiracy to violate the narcotic laws of the state held sufficient). All of these cases demonstrate a consistent holding on the issue dating back to *State v. Buchanan,* 5 H. & J. 317 (1821), where our predecessors first held that in a prosecution for conspiracy, it is sufficient to state in the indictment the conspiracy and the object of it; the means by which it was intended to be accomplished need not be set forth. We see no need to depart from this well settled law.

## IV

In Count Two of the indictment Winters was charged with making a fraudulent 1979 Maryland State personal income tax return with the intent to evade and defeat the payment of taxes. Further allegations set forth the particular means utilized by Winters. Count Three of the indict-

ment was similar to Count Two except it covered his amended return for 1979. Count Six again was similar except it covered the return made January, 1982. In all three counts reference was made to "Making a Fraudulent Income Tax Return—Article 81, § 302(a)." Prior to trial Winters moved to dismiss these counts on the ground that these counts did not furnish him with a description of the particular act he was alleged to have committed. This is so, he argues, because he was not apprised of the appropriate "prescribed tax" involved and Art. 81, sec. 302(a), prohibits the making of a fraudulent return with the intent to defeat or evade the payment of "taxes prescribed by this subtitle."

In our view all three counts pass muster. Winters was informed of sufficient information in each count to be apprised of the exact nature of the specific tax return he allegedly unlawfully, wilfully, and fraudulently made, and the particular years involved (Maryland State personal income tax return). He was also told he did so with the intent to evade and defeat the payment of taxes. Furthermore, the counts spelled out where on the return the false swearing occurred (on line 1 thereof). In our view each count sufficiently apprised Winters of just what he was charged with, and thus the counts were not defective under the *Ayre* standard.

## V

Appellant's next contention is disingenious. Simply put, it is that the trial court erred in not granting his motion for judgment of acquittal as to Counts Two, Three, and Six, since he was required under Maryland law to place on his Maryland return as taxable income the same figures used on his federal return as adjusted gross income. Winters contends "that the fact that the figure inserted on the federal return is a false statement is immaterial if Maryland law states that the taxpayer *must use* the figure inserted on his federal return." This is pure sophistry. While it is true that Maryland taxpayers are required to report on

their Maryland return the figure reported on their federal return as adjusted gross income, this does not authorize the reporting of a false figure on the federal return. Obviously the Maryland law contemplates the truthful reporting of income on the federal return; otherwise a defrauding taxpayer, while subject to federal prosecution, would escape state prosecution, a result hardly contemplated by the legislature. We see no merit to this contention.

## VI

Winters' final argument concerns the trial judge's answer to a question submitted to him by the jury after it had begun its deliberation. Count One of the indictment, as noted in footnote 2, alleged that Winters and Osborn conspired together to violate the Maryland income tax laws between January 1, 1979 and April 15, 1982. During deliberations the jury, having a copy of the indictment given them by the court, sent a note to the trial judge inquiring: "Why is the date on the indictment from January 1, 1979 to April 15, 1982, if we are dealing with tax years 1979–1980?" The record reflects the following to have taken place:

"COURT: I would anticipate calling the Jury back and tell them that this Indictment is not evidence in the case. The only reason they have it is so that they could uh ... know the number of uh ... crime [sic] that each stand accused of and to not take it as any evidence in the case.

MR. JORDON [Assistant Attorney General]: Your Honor, the State would also suggest that the dates are not an element of the crime.

COURT: For their consideration the dates and the uh ... Indictment are just not a subject for their deliberations.

MR. MURPHY [Counsel for Defendant Winters]: Well see, the problem is and it's an important one in the conspiracy case uh ... let's say they find there is a conspiracy but they are unable to find that it existed beyond 1980. Frankly uh .... these Defendants ought not to be found guilty of that conspiracy because it hasn't

been brought within the statute of limitations. So the ... the dates are of some importance I think for that purpose.

COURT: What is it that you want me to tell them?

MR. MURPHY: Well, let me think for a minute...

COURT: May I see that note?

MR. MURPHY: Oh yes.

MR. KOLE [Counsel for Defendant Osborn]: I'm sorry Your Honor.

MR. MURPHY: I think the uh ... one suggestion I have is that you state to them that uh ... the State has chosen to replace the charges for those periods of times.

MR. JORDON: I think Your Honor the dates are not elements of the crime of conspiracy.

MR. KOLE: But they do define the time in which the crime occurred.

COURT: I know that. But why ... why do they define the time which the crime occurred?

MR. KOLE: Well they had to give some time frame.

MR. MURPHY: For the purposes of the statute of limitations.

COURT: Of course. But that's a legal matter for the Court, not for the Jury. So I ... I ... it's just not an element for their deliberations. I'm going to tell them to ... pretty much as what I said ... you can take your exceptions.

MR. MURPHY: Alright. My exception ... you want me to take it now?

COURT: Why don't you wait till I get it. So you know exactly what I'm going to say.

MR. MURPHY: Alright. Okay. But my request is that Your Honor instruct them that if they are satisfied or if they are not satisfied that the conspiracy continued until ... into 1982 that they return a verdict of not guilty as to the conspiracy offense.

MR. JORDON: But that's not an element of the crime.

COURT: No, the Court will deny that request."

 Winters argues that the note from the jury indicated that the jury was concerned with whether the conspiracy continued to exist after the 1981 return had been filed; thus he was entitled to an instruction to the effect that if they found that the conspiracy did not so continue they would have to find for the defendant on that count.[3] In our view the trial judge was correct under the circumstances present here. As a general rule the question of limitations is a legal question to be answered by the court. *See Harig v. Johns-Manville Products Corp.*, 284 Md. 70, 394 A.2d 299 (1978). The evidence in this case was uncontroverted that the conduct, alleged to constitute a conspiracy to violate the Maryland income tax laws, continued into late 1982 or early 1983, clearly within the limitation period. To have given an instruction as requested by Winters would have been unwarranted as one not based on the evidence. Again we perceive no error.

JUDGMENT AFFIRMED.

APPELLANT TO PAY THE COSTS.

---

**3.** The period of limitation for conspiracy is 1 year; the indictment was filed 2/14/83.